Spragins v. Houghton.

THOMAS SPRAGINS, appellant, *v.* HORACE H. HOUGHTON, appellee.

*Appeal from Jo Daviess.*

Under the statute of the State of Illinois, every white male inhabitant of the age of twenty-one years, who has resided in the State six months immediately preceding any general election, is entitled to vote at such election, and the judges of election are compelled to receive his vote.

The question, whether the person offering to vote is an unnaturalized foreigner or a citizen, the judges of election have no right to investigate, under the existing laws. If such person takes the oath prescribed in the law, the duty is imperative upon the judges, to receive his vote, unless the oath is proved to be false.

The question whether the person offering his vote is an inhabitant, and entitled to the right of suffrage, within the meaning of that word in the Constitution, is not a subject of enquiry by the judges of the election.

There is no ambiguity in the word *resident*. Every man is a resident who has taken up his permanent abode in the State.

It is only when the judge of the election allows the exercise of the elective franchise by one whose right he suspects, or whose vote is challenged, without tendering the oath prescribed by the statute, that the judge violates his duty. He does not subject himself to the penalty for receiving an illegal vote, by admitting an alien to vote who has resided in the State six months immediately preceding an election, and who is a resident of the county where his vote is received, and who is a free white male inhabitant of the age of twenty-one years.

*Per* Smith, Justice:

Each State has the undoubted right to prescribe the qualifications of its own voters. And it is equally clear, that the act of naturalization does not confer on the individual naturalized, the right to exercise the elective franchise. The qualification which the voter is required to possess, in a Congressional election, depends entirely on the laws of the State in which the elective franchise is exercised, and is purely dependent on the municipal regulations of the State.

The term inhabitant is derived from the Latin *habito*, and signifies to live in, to dwell in; and is applied, exclusively, to one who lives in a place, and has there a fixed and legal settlement. The residence, however, is to be *bona fide*, and not casual or temporary.

To determine the qualification of an elector in this State, it would seem to be wholly unnecessary to enquire whether the elector was a citizen of the United States.

Unless the legislature shall make citizenship an indisputable qualification to the enjoyment of the elective franchise, and the Constitution clearly admits of the exercise of that power by that body, the Supreme Court cannot add such a prerequisite by construction.

Spragins *v.* Houghton.

THIS cause was argued at the December term, 1839, and on suggestion at the last June term, that the cause was fictitious, the Court required proof of its being a real cause, and continued it for that purpose (1)

At this term of the Court, in compliance with the order entered at the last term, the parties produced the following evidence, to wit :

The affidavit of Charles S. Hempstead, stating that he is personally acquainted with Horace H. Houghton, Thomas Spragins, and Jeremiah Kyle ; that he has been acquainted with Houghton and Spragins more than four years, and with Kyle about two years ; that they are all residents of the town of Galena, in Jo Daviess county, and that he knows of no other individuals of the same names.

The affidavit of Horace H. Houghton, stating that at the May term, 1839, of the Circuit Court of Jo Daviess county, he instituted an action of debt, under the statute, against Thomas Spragins, who was one of the judges of an election for Governor, &c., holden in the precinct of Galena, in said county, on the sixth day of August, 1838, for permitting Jeremiah Kyle, a native of Ireland, and not a naturalized citizen of the United States, to vote at said election ; and that the case was an agreed case, and was submitted to the Circuit Court of said county, upon the statement of facts as set forth in the transcript from the records of said Court ; and that the said case is a real one, and not a fictitious one, and that the facts set forth in the transcript did really transpire.

Thomas Spragins' affidavit, stating that, at the May term, 1839, of the Jo Daviess Circuit Court, an action of debt, on the statute, was brought against him, as one of the judges of an election held in the precinct of Galena, in said county, on the 6th day of August, 1838, by Horace H. Houghton, for permitting Jeremiah Kyle, a native of Ireland, and not a naturalized citizen, to vote at said election. That the case was an agreed case, and was submitted to the Circuit Court of said county upon the statement of facts, as set forth in the transcript from the records of said Court. That the said case is a real one, and not a fictitious one, and that the facts stated and set forth in the transcript did actually transpire ; that the said Jeremiah Kyle, whose deposition is annexed to the transcript, is the identical Jeremiah Kyle mentioned in the transcript, and that he knew no other person of the name. That, acting as judge of said election, he protested against receiving aliens' votes, believing that they were not qualified to vote, that the Constitution and laws of this State required that the person offering to vote should not only have resided six months in the State, but that he should be a citizen of the United States ; and that he admitted the said Kyle to vote at the time aforesaid, believing, at the time, that he was not a qualified voter, because he felt bound to yield to the opinion

(1) *Ante* 211.

of a majority of the judges of the election, they having decided that unnaturalized persons should be allowed to vote; yet, that the admission of the said Kyle to vote, was contrary to his belief of the law and right.

The affidavit of Jeremiah Kyle, stating that at an election held in the precinct of Galena, in the county of Jo Daviess, on the sixth day of August, 1838, he voted for all State and county officers voted for at that time, and for a representative to Congress; that Thomas Spragins was one of the judges of the election, at the window, where he voted; that he had resided in the State of Illinois more than six months immediately preceding the said election; that he is a native of Ireland, and had never been naturalized according to the laws of the United States; and that he has never known any other person of the same name in the State of Illinois.

Also a transcript of the record in this case remaining in the Jo Daviess Circuit Court, certified under the seal of the Court.

The cause was heard in the Court below before the Hon. Dan. Stone.

Stephen A. Douglass and Murray McConnel, for the appellant, relied upon the following points and authorities: First, 1st. It was the policy of the government by the Ordinance of 1787, and by the several acts of Congress for the government of the Territory Northwest of the river Ohio, to encourage emigration, by conferring upon alien inhabitants the right of suffrage, and other privileges. Ordinance of 13th July, 1787, in R. L. 53, 54, (1) permitting alien inhabitants to vote, if freeholders.

2d. Aliens may be freeholders at common law. 1 Bac. Abr. 173, 174; 1 Blac. Com. 286 ; N. Y. Dig. 47. The Ordinance, also, in effect, gives them the right to hold lands.

3d. The laws of Congress confer upon alien inhabitants, in said Territory, the right to vote. See 2 Story's L. U. S. 869, permitting Ohio to form a Constitution ; 3 Story's L. U. S. 1566, § 4, permitting Indiana to form a Constitution. See, also, 2 Story's L. U. S. 1250, § 1, abolishing property qualifications ; 3 Story's L. U. S. 1674, § 3, authorizing Illinois to form a State Constitution. These laws permitted alien inhabitants to vote for, and to be members of, the Conventions that formed the Constitutions of Ohio, Indiana, and Illinois. 12 Cong. Debates, Part 4, 4227 – 4230.

4th. In the Ordinance of 1787, there are certain articles of compact between the original States and the people and States N. W. of the river Ohio, which articles are declared to be the basis of any Constitution and State governments that should ever be formed in said Territory, and to be forever unalterable except by common consent. R. L. 55, (2). By the second article of said compact, it is provided, that the inhabitants of the said Territory shall always be entitled to the benefits of proportionate representation of the people

(1) Gale's Stat. 41.                          (2) Ibid. 42.

in the legislature.   By reference to other portions of the Ordinance, it will be seen, that the word inhabitant included alien as well as citizen inhabitants.   R. L. 53, 54, 56, 57, (1).

5th. The Constitution of this State was intended to be in conformity with the principles of the Ordinance and compact of 1787.

3 Story's L. U. S. 1675, § 4, authorizing Illinois to form a Constitution, provides that " the Constitution be not repugnant to the Ordinance."

Resolution of Congress, admitting Illinois into the Union, says, " the Constitution is in conformity to the principles of the compact." R. L. 33, 34, (2).   The preamble to the Constitution, says it is consistent with the Ordinance of 1787, and the act of Congress of the 18th April, 1818.   R. L. 34, (3).

Secondly.   1st. The Constitution, which was thus formed in part by the votes of alien inhabitants, did secure to them the right of suffrage.   This is shown by the facts, that whenever the Constitution speaks of the qualifications of an officer, it uses the words " citizen of the United States."   Art. 2, § 3.   A representative shall be a " citizen of the United States."

Art. 2, § 6.   A Senator shall be "a citizen of the United States."

Art. 3, § 3.   The Governor shall have been a " citizen of the United States " thirty years.

Art. 3, § 13.   The Lieutenant-Governor shall possess the same qualifications.

Schedule, § 14.   The Lieutenant-Governor shall be a " citizen of the United States."   These are the only instances, in which the words " citizen of the United States " are used in the Constitution.

2d.  Whenever the Constitution speaks of a voter, or elector, it uses the word " inhabitant," and not citizen of the United States.

Art. 2, § 27.   "All white male inhabitants shall vote," &c.   Schedule, § 12.   " All white male inhabitants shall vote at the first election," &c.

3d.  The Constitution uses the word " inhabitant" when speaking of the people *en masse*, including black and white, citizens and aliens.   Art. 2, § 5–31.   Art. 8, § 8.   Thus it will be seen, that the words " citizen of the United States," and " inhabitants," are not used as synonymous terms.

Thirdly.   1st. The word "inhabitant," as used in the 27th section of the 2d article of the Constitution, does not mean citizen of the United States.   The word " inhabitant " has a certain and definite meaning, — one who dwells, lives, resides, or has his home in . a place.   Webster's Dictionary, Walker's Dictionary.

The word " citizen" has various meanings, but a " citizen of the United States " is a person native born, or naturalized according to the acts of Congress.

(1) Gale's Stat. 40, 41, 43, 44.     (2) *Ibid.* 24.     (3) *Ibid.* 25.

2d. As to the difference between " citizen" and " inhabitant," see Contested Elections in Congress, page 415, 416 ; 1 Vattel, ch. 19, § 213 ; 1 Kent Com. 344 ; Const. Mich., Art. 2, § 1 ; 12 Cong. Deb., Part 4, 4227 – 4289 ; Territorial Laws of Michigan, in same book, Act of the 26th January, 1835 ; 12 Cong. Deb., Part 4, 4245, 4246, 4252, 4253 ; 12 Cong. Deb., Part 1, 1015, 1016, 1036, 1037, 1039 – 1044, 1047 ; — Mr. Clay's amendment, and the vote before it. Act of Congress of the 15th June, 1836, § 2, accepting, ratifying, and confirming the Constitution of Michigan, which admitted aliens to vote. 4 Story's L. U. S. 2442. All of these authorities show, that the word " inhabitant" includes aliens as well as citizens.

Fourthly. 1st. Under the Constitution of the United States, each State has the right to prescribe the qualifications of its own voters. Const. U. S., Art. 1, § 2 ; Federalist, No. 52, page 226 ; 2 Story's Com. Const. 57 to 66 ; 12 Cong. Deb., Part 1, 1036 ; Part 4, 4266.

2d. Each State has exercised this power from the organization of the government. Book of Constitutions ; Vermont, page 90, aliens vote, and hold office.

Constitution of New York ; negroes vote. North Carolina permits free negroes and aliens to vote. 2 Kent Com. 61 ; 2 Story Com. Const. 58 to 65.

3d. The naturalization laws have no reference to the elective franchise, neither conferring nor restraining it, in this country or in England. 1 Blac. Com. titles " *Alien*," " *Denizen*," &c. ; 2 Kent Com. 61 ; 12 Cong. Deb., Part 4, 4246, 4247 ; 4 Harris & McHenry 340.

4th. A State may confer upon aliens the right to hold real estate, to vote, or hold office, &c., without making them citizens, or violating the naturalization laws. 2 Kent. Com. 60 ; R. L. 626 ; (1) Book of Constitutions, 90.

5th. The contemporaneous exposition of the Constitution, by its framers, who were members of the legislature, and by the different departments of the government, and the universal practice under it for more than twenty years, has been, that alien inhabitants have a right to vote. Laws of 1819, Act regulating elections, of 1st March, § 14, page 93, prescribes the oath of the voter ; " that he has resided in the State six months." No citizenship required ;

Laws of 1821, 76, same oath, no citizenship required ;

Laws of 1823, 58, § 15 ; same oath, no citizenship required ;

Laws of 1825, 166, penalty for rejecting voter after oath taken.

(1) Gale's Stat. 698.

Laws of 1826, in R. L. 384,(1) inhabitants vote for justices of the peace ;

. Laws of 1829, R. L. 246, 247 § 12,(2) oath as to six months' residence, but citizenship not required. All these acts approved by Governors Bond, Coles, and Edwards, and the judges of the Supreme Court, sitting as a Council of Revision. 1 Peters' Cond. R. 316, 317.

This cause was argued by CYRUS WALKER, SCHUYLER STRONG, and JUSTIN BUTTERFIELD, for the appellee.

Mr. Butterfield furnished the Reporter with a copy of his argument. The Reporter has not been able to obtain either a copy of the argument or brief of Mr. Walker or Mr. Strong.

Mr. Butterfield's argument was as follows :

This action was brought for the recovery of the penalty imposed by the statute, which declares, that " If any judge of election shall knowingly admit any person to vote, not qualified according to law, &c., he shall forfeit and pay to the county the sum of one hundred dollars, to be recovered in any court of record, in the name of the State, for the use of the county, in an action of debt, with costs of suit, or at the suit of any person who may sue for the same," &c. Gale's Stat. 268, § 23.

The only question presented by this case for the consideration of the Court, is, whether an alien " is qualified by law to vote in this State for Governor, members of the State legislature, and representatives to Congress. The agreed case admits, that at the time the defendant below received and counted the vote, he knew that Kyle was not a citizen of this State, or of the United States ; that he was a native of the kingdom of Great Britain, and had not been naturalized according to the laws of the United States. The defendant, as one of the judges of election, knowingly admitted an alien to vote for the officers aforesaid, and has subjected himself to the penalty inflicted by the statute, unless an alien is a qualified voter. The judges of election, like all other persons, are presumed to know the law ; it is their duty, and they have the power, to exclude all unqualified voters ; but if, on the contrary, with a full knowledge of all the facts, as in this case, they admit an unqualified person to vote, they subject themselves to the penalty of the statute.

The 27th section of the 2d article of the Constitution of this State, declares, that " In all elections, all white male inhabitants above the age of twenty-one years, having resided in the State for six months, shall enjoy the right of an elector."

It is contended on the part of the appellant, that the word " in-

(1) Gale's Stat. 400. (2) *Ibid.* 263.

habitants" comprehends resident aliens, and confers equally upon them, as upon citizens, the right to vote.

The Constitution, like a statute, is law, and the same rules of construction apply to the one as the other. It is an established rule in the exposition of statutes, that the intention of its framers is to be deduced from the whole and every part of a statute taken and compared together. The real intention, when accurately ascertained, will always prevail over the literal sense of the terms.

Again ; "the reason and intention of the lawgiver, will control the strict letter of the law, when the latter would lead to palpable injustice, contradiction, and absurdity." 1 Kent 461, 462.

Another rule of construction is, "that several acts *in pari materia*, and relating to the same subject, are to be taken together, and compared in the construction of them, because they are considered as having one object in view, and acting upon the same system."

The State and the federal Constitutions are both parts and parcels of the same great system of republican government ; they had the same object in view, and are, if possible, to be so construed as to harmonize with each other, and add strength and stability to the whole.

According to the theory of our government, the supreme or sovereign power is vested wholly in the citizens, or, in the language of the Constitution, in the "people," a word evidently used as synonymous with citizens. The people are declared to make the Constitution, not for aliens, but for "themselves and their posterity."

If the people, in the formation of their State Constitution, intended to impart a portion of their sovereign and political rights to any and all aliens who might thereafter choose to come among them, this intention ought not to be collected "from general words, which do not necessarily imply it, but from clear and manifest expressions, which are not to be misunderstood."

The word "inhabitants," as used in the Constitution, may be restrained to such inhabitants as are citizens ; such construction comports with the general design of the Constitution, and is in accordance with the construction which has always been given to the same word, when used in the same manner in the Constitutions of other States.

A general impression prevails throughout the Union, that the Constitution of this State contains some new and peculiar provisions, in relation to aliens ; that it extends to them privileges not found in the Constitution of any other State, and expressly grants to them the right of voting at our elections. This impression is entirely erroneous ; so far from our Constitution extending any superior rights to aliens, the words of grant in the Constitution of this State, under which it is claimed that aliens have the right to vote,

are precisely the same as are used in the former Constitution of the State of New York, and as are still used in the Constitutions of several other States, where the idea, that an alien has a right to vote, has always been repudiated.

The practice which has been pursued in this State, of allowing aliens to vote, is wholly unauthorized by the Constitution ; the difficulty is not in the Constitution itself, but in the erroneous construction that has been put upon it, and which is now, for the first time, sought to be legalized by the judicial tribunals.

The former Constitution of the State of New York, adopted in 1777, and which remained in force until the formation of her new Constitution, in 1821, conferred the right of voting upon " every male inhabitant of full age, who had resided in one of the counties of the State, for six months preceding the day of election." The word "inhabitant" is used in this Constitution, in the same manner as in the Constitution of Illinois ; and if the word "inhabitant," as used in the Constitution of New York, embraced aliens, and conferred on them the right of voting, then it would be a gross violation of the express terms of her Constitution, to pass a law restraining aliens from the exercise of their constitutional rights. Yet the doctrine that an alien had a right to vote, under the word "inhabitant," as used in her Constitution, was never adopted ; no one, in favor of " the largest liberty," ever contended for such a construction ; and the legislature of that State, at an early day, passed a law restricting the right of voting to such inhabitants as were citizens. Every voter, when challenged, was required to take an oath that he was a natural born or naturalized citizen of the State of New York, or of one of the United States. 2 N. Y. R. L. of 1813, p. 252.

The existing Constitution of New Hampshire, as altered and amended in 1792, confers the right of voting upon every " male inhabitant of each town and parish, of the age of twenty-one years, excepting paupers, and persons excused from paying taxes, at their own request." Yet the legislature of that State, have, by law, not only restricted the right of voting to such inhabitants as are citizens, but there is a law on their statute book, imposing a penalty of thirty dollars on every alien who shall vote.

The Constitution of Ohio confers the right of voting upon " all white male inhabitants," above the age of twenty-one years, having resided in the State for one year next preceding the election. And yet the legislature of that State have, by law, restricted the right of voting to such inhabitants as are citizens.

The Constitutions of the following States confer the right of voting upon male residents, of the age of twenty-one years, in the following words :

Vermont, " every man," &c.; Rhode Island, " the freemen," &c.; New Jersey, " all inhabitants " ; Maryland, " all freemen,"

&c.; North Carolina, "all freemen." In Virginia, the old Constitution of 1776, and which remained in force until amended in 1830, confers the right of suffrage "on all men having sufficient evidence of permanent common interest, with an attachment to the community."

The Constitution of Massachusetts, adopted in 1780, conferred the right of suffrage, for representatives, upon "every male person," being twenty-one years of age, and having resided in the State for one year, and having a freehold estate of the annual income of three pounds, or any estate of the value of sixty pounds. Yet it is believed that aliens, since the adoption of the federal Constitution, have not been allowed to vote.

Most of the original States established their Constitutions during the revolution, or during the confederation; and when the federal Constitution was subsequently framed, the original States surrendered many powers which they were expressly authorized to exercise under their respective Constitutions. This necessarily produced some conflict between the States and the federal Constitution. But the States did not deem it necessary immediately to call conventions to amend their Constitutions, but they honestly, and in good faith, refrained from the exercise of any of the powers which they had delegated and surrendered to the general government. Although the grant of the right of suffrage, in the Constitutions adopted by the original States during the revolution, was sufficiently comprehensive to embrace all the inhabitants engaged in that struggle, and who, by the treaty of peace, became citizens, yet none of the States, after the adoption of the federal Constitution, ever contended that they had the power to naturalize aliens, or to authorize aliens to vote, or to impart to them any of the sovereign powers vested in the people.

The grant of the power to vote, as contained in the Constitution of this State, was evidently copied from the then existing Constitution of New York or Ohio. Congress undoubtedly admitted this State into the Union, and ratified her Constitution, with the understanding that we should put the same construction upon the word "inhabitant," as had been universally put upon the same word, when used in the Constitutions of other States.

No one can for a moment suppose that Congress would have admitted this State into the Union, with a Constitution that would authorize aliens to send representatives to Congress, to assist in our national counsels, and to participate in the election of President and Vice-President of the United States, while all other States were restricted to the votes of citizens. Would such be an admission of this State into the Union, "upon an equal footing with the original States"?

It is conceived that the admission of alien votes in this State, is a violation of the spirit and meaning of the Constitution of the United

States, and a fraud upon our sister States. The power of naturalization, which is vested exclusively in Congress, necessarily implies that no alien can enjoy the full rights of a citizen, except by naturalization.

In an elective government, the "sovereign power" is vested in the people. The people can only act and speak through their agents, duly elected. The elective franchise is then a sovereign power, and cannot be conferred upon an alien, except by naturalization.

The question, whether an alien has a right to vote, must finally be settled by resort to the Constitution of the United States.

I hold that so much of the Constitution of any State as purports to confer a right to vote, upon aliens, is repugnant to the Constitution of the United States, and void.

The question has been put by opposing counsel, in a triumphal manner, "Where exists the power to declare the Constitution of this State unconstitutional?" I answer, that "the judges of every State are bound so to do, whenever the Constitution of a State is repugnant to the Constitution of the United States."

The Constitution of the State is not the supreme law of the land, but whenever it conflicts with, it is subordinate to, the Constitution of the United States. The second section of the sixth article of the Constitution of the United States declares, "This Constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties, &c., shall be the supreme law of the land; and the judges of every State shall be bound thereby, any thing in the Constitution or laws of any State to the contrary notwithstanding."

No State can pass naturalization laws; by the Constitution of the United States, "Congress have power to establish a uniform rule of naturalization." This power is necessarily vested exclusively in Congress. The Constitution of the United States declares, "that the citizens of each State shall be entitled to all the privileges and immunities of the citizens in the several States." The only purpose of granting the power of naturalization to Congress, was to deprive the States individually of the power of naturalizing aliens according to their own will and pleasure, and thereby giving them the rights and privileges of citizens in every other State. If each State could naturalize upon one year's residence, when the act of Congress requires five, of what use is the act of Congress, and how does it become a uniform rule? 1 Kent 424.

Before the adoption of the Constitution of the United States, each State did exercise the power of naturalizing aliens; and although, in the early days of the Constitution of the United States, it was once held, in Pennsylvania, that the States still enjoyed a concurrent authority with the United States upon the subject of naturalization, yet that doctrine has long since been exploded, and it is now the settled law, that the power of naturalization is vested

exclusively in Congress; that the power of naturalization ` has been surrendered by the States; that it is a national power, and can only be exercised by the national government. The power of naturalization given by the Constitution of the United States, necessarily implies, that no alien can be converted into a citizen, or enjoy the full rights of a citizen, except by the process of naturalization. The government of the United States was established by the people of the United States, to secure the blessings of liberty to themselves and their posterity, as declared in the preamble to the Constitution.

The government of the United States is a political corporation. The people who framed the Constitution, and their posterity, are the members. An alien cannot become a member of this corporation, unless by some express agreement to receive him.

" The only natural difference between a native and a foreigner in respect to their becoming members of any particular civil society, is, that the native was certainly never united to any other society, whereas the foreigner may possibly have been united to some other, before he came to settle within the territories of this. The effect of this doubt concerning the possibility of the foreigner's being a member of some other civil society, is, that he cannot become a member of the nation in whose territories he settles, without some express stipulations by which he engages his allegiance to this nation, and is formally received by it. If he continues there at any time before he makes these express stipulations, and before he is formally received as a member, he is obliged to behave himself peaceably, and to submit to the laws of the country; because the society would not suffer him to stay within its territories, upon any other terms. This peaceable behavior, therefore, is no evidence, on his part, that he owes no allegiance anywhere else; and the society, by allowing him to stay within its territories, before this point is cleared up, cannot be understood tacitly to receive him as a member." Rutherford 265.

There is no way by which an alien can engage his allegiance to this country, and be formally received by it, except by naturalization.

Naturalization is the renouncing and abjuring allegiance, by an alien, to his parent country, and swearing allegiance to his adopted country. It is the only way by which he can unite himself with, and become a member of, our political family; it is the only way by which he c , be rendered competent to have the right of suffrage conferre. upon him.

If the States cannot exercise the power of naturalization, can they confer all the political rights which naturalization gives? If they cannot make an alien a citizen, can they give him, by piecemeal, all the rights which belong to a citizen, and thus indirectly exercise the power of naturalization?

A State may grant to an alien the privilege of taking, holding, and conveying real and personal property, but it is clear that he cannot be admitted to participate in the sovereign power of the country, until after naturalization. The impolicy of allowing aliens, who owe no allegiance to our country, but who do owe allegiance to a foreign country, to elect our rulers, make our laws, and impose our taxes, is apparent. History furnishes no precedent of any nation on earth ever having permitted aliens, equally with the native inhabitants, to participate in the sovereign rights of the country, before they had been admitted as members of the same national family. No nation could long exist, who would suffer such an impertinent intermeddling with their political rights by foreigners. When the exercise of the elective franchise is surrendered into the hands of those who owe no allegiance to our country, but who do, in fact, owe allegiance to a foreign country, who are not subject to indictment for affording aid and comfort to our enemies in time of war, nor liable to perform military duty, the purity and the value of the elective franchise is destroyed.

It is a fair test of the soundness of any principle to trace it out, in all its ramifications, and see to what result it will lead.

If a State can confer the right of suffrage on aliens who have resided within her limits for six months, she has the right to modify, or altogether dispense with the condition of residence, and extend the right of voting to aliens after a residence of twenty-four hours, or on the same day of their landing upon our shores.

It has been very zealously contended, by counsel upon the other side, that the Ordinance of the 13th of July, 1787, " *For the Government of the Territory of the United States, Northwest of the river Ohio,*" conferred upon aliens the right to vote for representatives to the legislative Assembly of that Territory, and that therefore the States which have been subsequently formed out of the same Territory, have also a right to confer the right of voting upon aliens. This is the substance of the argument. All that part of the said Ordinance which relates to the establishment of a government in said Territory, the election of representatives to a territorial Assembly, and the qualifications of the electors and the elected, was a mere temporary act of Congress, held under the Confederation, for the temporary government of said Territory. This part of the Ordinance was subject to be repealed, altered, and changed by a subsequent Congress, and was changed and modified by Congress at every time a new territorial government was carved out of the Northwest Territory. It is entirely useless to wade through the mass of the temporary congressional legislation in relation to the government of the Northwest Territory. Whether aliens were or were not allowed to vote while the district of country out of which this State is formed, was a Territory, can have no possible bearing upon the rights, powers, and duties of this State, after she was admitted a member of the Union. The Territories of the United States are merely

under the government and protection of Congress; they have no voice in our national counsels, nor in the making of our laws. Whatever course Congress has pursued in the government of its territories, whatever privileges she has extended to or denied them, can have no effect in adding to or taking from the constitutional rights of the States which may be formed out of those Territories. The six concluding articles of the said Ordinance are declared to be articles of compact between the original States, and the people and States in said Territory, and for ever to remain unalterable, unless by common consent. The fourth article provides, that the States which may be formed out of the said Territory, "shall for ever remain a part of this Confederacy, subject to the articles of confederation, and to such alterations therein as shall be constitutionally made." After the making of this Ordinance, on the 17th of September, 1787, the Constitution of the United States was established, and thus the States to be formed out of the said Territory, by the express provision of the Ordinance, became subject to the Constitution of the United States.

Again; the fifth article of the Ordinance provides, that the States to be formed out of said Territory shall be admitted into the Congress of the United States, "on an equal footing with the original States, in all respects whatever."

After these stipulations in the Ordinance, it would seem to be absurd to contend, that the States formed out of the Northwest Territory, possess any other or different rights, than the original States. I understand the argument on the other side to be, that this State has the constitutional right to grant to an alien who shall come into the State, after the formation of her Constitution, and reside here six months, the right of suffrage, although the original States have no power to do the same thing. If this is not the argument, then why have counsel gone into so labored an examination of the territorial laws, as though the States formed out of this Territory enjoyed some peculiar constitutional privileges, not conferred upon the original States?

It has been said that the admission of Michigan into the Union, with her Constitution, in some way gives color to the right of the States to extend the right of voting to aliens. Whereas, the very reverse is the fact; the following is the article in the Constitution of Michigan. "In all elections, every white male citizen above the age of twenty-one years, having resided in the State six months next preceding any election, shall be entitled to vote at such election; and every white male inhabitant of the age aforesaid, who may be a resident of the State at the time of the signing of this Constitution, shall have the right of voting as aforesaid." Congress, by ratifying this Constitution, did not decide that a State had the power to naturalize aliens; nor to extend to them the right of suffrage, but they did decide that when Congress admitted a State into the Union, the admission may extend to the inhabitants who

reside there at the time, as well as to the Territory ; that the admission of a State into the Union, may operate as a special act of naturalization to the inhabitants.    It is limited to such inhabitants as were there at the time of the signing of the Constitution.

Aliens who go into the State after the signing of the Constitution, cannot be naturalized by the State, nor admitted to the right of suffrage.    The case now under discussion, is not the case of an alien who resided here at the time of the admission of this State into the Union.    The agreed case admits that he had not been naturalized in any way ; nor had he resided in the State over a year.

The clause in the Constitution of the United States, which declares that the electors of each State shall have the qualifications of electors of the most numerous branch of the State legislature, confers no power upon the State to extend the right of suffrage to aliens.    It speaks of "electors."    It means those who have the capacity to be electors ; though every citizen might not be an elector, no one can be an elector who is not a citizen.

Our government is an experiment ; it is elective in all its features, — elections are the source and fountain of its life ; its health and perpetuity depend upon their purity, they should be guarded as with a flaming sword.    But if, on the contrary, the doors of election are flung open, if all nations, tongues, and kindred are invited, without any preparation for the change, to congregate at our polls, to elect our rulers, and make our laws ; the time will come, when foreign enemies, who cannot conquer us with their arms, will unite with a faction, and conquer us with their votes.

SMITH, Justice :

This is an action of *debt* brought to recover a penalty for the alleged misconduct of Spragins, as judge of an election, stated in the record, to have been holden in this State, in the county of Jo Daviess, in August, 1838.

The cause comes into this Court by appeal from the Circuit Court, where it was entered without process, and upon the following statement of facts, in the form of an agreed case :

" The defendant was one of the judges of an election, duly appointed and qualified according to law, at the August election, 1838, for the precinct of Galena, in the county of Jo Daviess, and acted as such, and received votes at that election, to wit, on the sixth day of August, A. D. 1838.    It is further agreed and understood, that one Jeremiah Kyle voted at that election, for all State and county officers voted for at that time, to wit, Governor, Lieutenant Governor, Representatives to Congress, Senator to the General Assembly, two Representatives to the General Assembly, Sheriff of the county, three County Commissioners, Coroner, and County Constables.    The defendant was one of the judges at the

window, when the said Jeremiah Kyle voted. It is agreed and admitted both by plaintiff and defendant, that the said Kyle was not, at the time he voted, a citizen of the United States, but that he was a native of Ireland, and had never been naturalized according to the laws of the United States, or of this State.

" It is also agreed that the said Kyle had resided in this State, and in the county of Jo Daviess, more than six months immediately preceding the election, at which he voted as aforesaid.

" The defendant admitted the said Kyle to vote, and had his name inserted in the poll books, and counted his vote as a good and proper vote under the Constitution and laws of this State, knowing before, and at the time when the said vote was admitted and counted, that Jeremiah Kyle was not a citizen of the United States, or of this State ; and knowing that he was a native of the Kingdom of Great Britain and Ireland ; and knowing at the time his vote was given, admitted, and counted as stated above, that he was not naturalized according to the laws of the United States and of this State. It is further agreed and admitted, that the defendant, acting as judge of the said election, received and counted the vote of the said Jeremiah Kyle, believing at the time, that he was not a qualified voter ; the defendant himself believing that the Constitution and laws of this State, not only required a residence of six months, but also, that the person offering to vote, should be a citizen of the United States. It is agreed that if the Court shall be of opinion, upon the foregoing statement of facts, that the said Jeremiah Kyle was not a qualified voter, according to the Constitution and laws of this State, the judgment shall be entered against the said defendant, for the sum of one hundred dollars, one half for the use of the plaintiff in this action, and the other half for the use of the county of Jo Daviess, and costs of suit ; but, if the Court shall be of opinion that the said Jeremiah Kyle was a qualified voter, according to the Constitution and laws of this State, then this suit to be dismissed at the costs of the plaintiff."

Upon this agreement, the Circuit Court rendered judgment against Houghton, for one hundred dollars, in conformity with the stipulation of the parties.

The case is now presented for the revision of this Court, and the appellant insists, that according to the Constitution and laws of this State, Jeremiah Kyle was a legal, qualified voter, and was duly and legally admitted to vote, at the election in Jo Daviess county, holden in August, 1838, and therefore, the Circuit Court decided erroneously in rendering judgment against him.

The case has been argued at great length, and with much ability.

The points presented for examination and consideration, are doubtless of deep interest, inasmuch as the judgment of the Circuit Court changes the rule regulating the exercise of the elective

franchise, which has prevailed ever since the adoption of the State Constitution, under that Constitution and the laws of the State, which have been uniform and unchanged, as to the qualification of voters during that period, and has now, for the first time, received a new and entirely different construction from that which has hitherto prevailed ; which if it be a just and true exposition of our Constitution, and the laws regulating elections in this State, will deprive a large portion of the inhabitants of the State, of the hitherto admitted invaluable exercise of the right of suffrage.

The serious character of the question presented for consideration, and the magnitude of the interests involved, obviously demand of this tribunal, the exercise of its most cautious, earnest, and deliberate judgment, before a decision be pronounced. No considerations but those of imperative duty, founded on the solemn convictions of the weight and justice of its reasons for the foundation of its opinion, ought to prevail ; and in the conclusions to which it should arrive, it should be alone animated by a desire to decide the question upon a just interpretation of the Constitution and laws of the State. The effects of its decision, if just and accurate, cannot be looked to, be they what they may as regards those who may have supposed ulterior political consequences might arise therefrom, according to the predominance of the views of the one side or the other of the questions discussed. The duty of the Court is as plain as it is imperative. It must decide the case as it finds the facts arising on the record, and agreeably to the manifest intentions of the Constitution and laws of the State.

What might or might not be expedient, or more conformable to a supposed more proper principle of political economy, than the rule the framers of the Constitution and laws of the State have thought proper to adopt, and by which the case must be alone governed, is not for the Court to assume, as a rule of action, to govern its determination.

The plain and obvious import of the Constitution and laws, it is the duty of the Court to ascertain ; and when there is neither ambiguity nor doubt, the result can be easily arrived at.

It becomes important then to enquire what qualifications the Constitution has prescribed a person shall possess to entitle him to exercise the right of voting at elections in this State. The 27th section of the 2d article of the Constitution, declares, " In all elections all white male inhabitants, above the age of twenty-one years, having resided in the State six months next preceding the election, shall enjoy the right of an elector, but no person shall be entitled to vote except in the county or district in which he shall actually reside at the time of the election." In reference to the first general election holden under the Constitution, it is declared, in the 12th section of the schedule to the Constitution, that " All white male inhabitants above the age of twenty-one years, who shall be actual residents of

this State, at the signing of this Constitution, shall have the right to vote at the election to be held on the third Thursday, and the two following days, of September next." (1)

It is here to be remembered, that the Constitution of the State of Illinois was required, by the act of Congress of the 18th of April, 1818, to be republican, and not repugnant to the Ordinance of the 13th July, 1787, between the original States, and the people and States of the Territory Northwest of the river Ohio, excepting so much of said articles as relate to the boundaries of States therein to be formed.

By the resolution of the Congress of the United States, of the 3d December, 1818, it is expressly declared, that the Constitution and State government so formed is republican, and in conformity to the principles of the articles of compact between the original States, and the people and States in the Territory Northwest of the river Ohio, passed on the 13th July, 1787 ; and that the State of Illinois should be admitted into the Union, upon an equal footing with the original States, in all respects whatsoever.

It is of importance here to ascertain whether the Ordinance of 1787 permitted resident aliens to be representatives in the territorial legislatures, and to vote at elections for representatives. By the Ordinance it is provided, that no person shall be eligible, or qualified to act as a representative, unless he shall have been a citizen of one of the United States three years, and be a resident in the district, or unless he shall have resided in the district three years ; and, in either case, shall likewise hold in his own right, in fee simple, two hundred acres of land within the same ; provided, also, that a freehold in fifty acres of land in the district, having been a citizen of one of the States, and being resident in the district, or the like freehold, and two years residence in the district, shall be necessary to qualify a man as an elector of a representative. (2)

It will readily be perceived, that the qualification for eligibility to the office of representative in the territorial legislature, is twofold ; first, three years a citizen of one of the United States, and a resident of the district, and the owner in his own right, in fee simple, of two hundred acres of land, within the district ; or, secondly, three years residence in the district, and the like owner of two hundred acres of land, without being a citizen of one of the United States.

The qualification to vote for such representative is, first, a freehold in fifty acres of land in the district, and having been a citizen of one of the States, and a resident of the district ; or, secondly, a like freehold of fifty acres of land, and two years residence in the district.

The policy of the Ordinance here disclosed, continued to be the

(1) R. L. 48; Gale's Stat. 36.     (2) R. L 54; Gale's Stat. 41,

policy of the Congress of the United States, with various modifications in favor of the extension of the right of suffrage in the Territories, from time to time, as its various acts of legislation disclose; and distinctly recognise and authorize aliens to enjoy the elective franchise. The emphatic term *man*, it will be seen, is used as marking the person who is to exercise the right, whether that man be a citizen or resident of the Territory.

Thus, the "*Act to enable the people of the Eastern division of the Territory Northwest of the river Ohio, to form a State Constitution and State Government, and for the admission of such State into the Union, on an equal footing with the original States, and for other purposes,*" declared, " That all male citizens of the United States, of full age, who resided within the Territory one year previous to the day of election, and who had paid a territorial or county tax; and also all persons having, in other respects, the legal qualifications to vote for representatives in the General Assembly of the Territory, were authorized to choose representatives to form a convention to frame a Constitution and State government." (1) This same provision, with the exception of the term of residence being reduced from one year to one day, was incorporated in the act to enable the people of Indiana Territory to form a Constitution and State government, and for the admission of such State into the Union. (2)

The act to enable the people of the Illinois Territory to form a Constitution and State government, and for the admission of the State into the Union, is precisely similar, except in the reduction of the time of residence to six months. (3)

The several acts of Congress erecting and regulating the territorial government, passed from time to time, not only prescribed the qualification of voters, but gave to aliens as well as citizens the right of electing and being elected to office.

Under the terms used in the acts to enable the people of the Territories referred to, to form Constitutions and State governments, it will be perceived, that "all persons having, in other respects, the legal qualifications to vote for representatives," were permitted to vote for members of the State conventions; thereby including aliens as well as citizens, who possessed the other qualifications then and there enumerated in the law.

In May, 1812, the Congress of the United States passed an act to extend the right of suffrage in the Illinois Territory, having previously, on the 3d of February, 1809, by an act, established the Territory of Illinois, and granted to the inhabitants the same rights, privileges, and advantages as were secured to the people of the Territory of the United States Northwest of the river Ohio, by the Ordinance of 1787 ; and so much of the same Ordinance as relates

(1) 2 Story's L. U. S. 869.        (2) *Ibid.* 1565.        (3) *Ibid.* 1674.

to the organization of the General Assembly in said Territory, was declared to be in force and operation in the Illinois Territory.

The act of May, 1812, provides, That upon the admission of the Illinois Territory into the second grade of government, each and every white male person, who shall have attained the age of twenty-one years, and who shall have paid a county or territorial tax, and who shall have resided one year in said Territory, previous to any general election, and be, at the time of such election, a resident thereof, shall be entitled to vote for members of the Legislative Council, and House of Representatives for said Territory. By the third section of the act, the right of voting for a delegate to Congress was extended to the same persons. It will be seen, that this act abolished the property qualification before required, and extended the right of suffrage to all white male persons; making no discrimination between the citizen and the resident of foreign birth. It will also be further perceived, that while the right of electing and being elected to office is conferred on persons who are neither natives nor naturalized citizens of the United States, these same persons were permitted to become members of the conventions which formed the Constitutions of Ohio, Indiana, Michigan, and Illinois; and it is notorious that those Constitutions were adopted by a portion of votes given by persons who were not citizens of the United States. Under this undeniable policy, and after it had been practised on in the Illinois Territory, for a period of more than six years, the Constitution of Illinois was formed, and the provision relative to the elective franchise adopted.

It is conceived that misapprehension prevails, to a considerable extent, as to the right of a State to admit other persons than citizens, native or naturalized, to vote at elections. Each State has the undoubted right to prescribe the qualifications of its own voters. And it is equally clear, that the act of naturalization does not confer on the individual naturalized, the right to exercise the elective franchise. While other civil rights are conferred by it, that of voting at elections for officers of State, is not one, unless the party possess the other requisite qualifications, defined by the State law, where citizenship is one of the necessary requisites to its exercise.

The first paragraph of the second section of the first article of the Constitution of the United States, declares, that the electors in each State shall have the qualifications requisite for electors of the most numerous branch of the State legislature. This is alone applicable to the choice of members of the House of Representatives of the United States, and is regulated, of course, by the qualifications prescribed by the State laws, for the qualification of its voters in the choice of its representatives in its own legislature. The qualification which the voter is required to possess in a Congressional election, depends entirely on the laws of the State in which the elective franchise is exercised, and is purely dependent on the

municipal regulations of the State.  The Constitution of the United States, in this particular, is wholly subordinate to the legislative will of the  State ;  whatever it prescribes is adopted, as the qualification of the voter for member of Congress.  In speaking of this provision of the Constitution of the United States, the 52d number of the  Federalist, written by Mr. Madison, contains the following just comments :  " To have reduced the different qualifications in the different States to one  uniform  rule, would  probably have been as dissatisfactory to some of the States, as it would have been difficult to the Convention.  The provision made by the Convention appears, therefore, to be the best that lay within their option.  It must be satisfactory to every State, because it is conformable to the standard already established, or which may be established, by the State itself. It will be safe to the United States, because, being fixed by the State Constitutions, it is not altered by the State governments; and it cannot be feared, that the people of the States will alter this part of their Constitutions, in such manner as to abridge the rights secured to them by the federal Constitution."

Each State of the Union has not only exercised this power, at discretion, ever since the first organization of the government of the United States under its own Constitution, original, modified, or changed, in any manner whatsoever, but the qualifications of electors are variant and dissimilar in many of the States ; some differing in the period of residence ; others making the possession of real estate essential ; and others permitting, on certain conditions, free negroes to enjoy the right of suffrage.   Hence, in all of the States, there may be frequently individuals who cannot exercise the right of suffrage, although native citizens, because of the want of the possession of the requisite legal qualifications.

The question, what is the true reasonable interpretation of the 27th section of the 2d article of the State Constitution, defining the qualifications of an elector, is now to be considered, under the antecedent practice which it is seen prevailed under the provisions of the ordinance and acts of Congress.

To arrive at a just solution of this enquiry, it is important to ascertain, with exactitude, the true definition and meaning of the term inhabitant, as used in the section of the Constitution under consideration.

The term inhabitant is derived from the Latin *habito*, and signifies to live in, to dwell in ; and is applied, exclusively, to one who lives in a place, and has there a fixed and legal settlement. It embraces localty of existence.   It refers to the place of a person's actual residence, and excludes the idea of an occasional or temporary residence ; and, as used in the section referred to, the place where the elector dwells, at the time of his voting.

The term is conceived to be entirely free from technicality, and has a known and universally accepted meaning; all agreeing in

considering inhabitant as directly connected with habitation and abode. It is supposed, that a term of no technicality, so simple and expressive in itself, and so clear and definite in its character, is susceptible of but one meaning. This residence, however, is to be *bona fide*, and not casual or temporary. To determine, then, the qualifications of an elector in this State, it would seem to be wholly unnecessary to enquire whether the elector was a citizen of the United States. Possessing the qualifications declared in the Constitution, and recapitulated in the law of elections, he should be deemed a qualified voter, and admitted to vote, though not a citizen of the United States.

It is, however, strenuously contended, that the term inhabitant is synonymous with citizen, and should receive the same interpretation. To test this argument, let us consider in what sense the framers of the Constitution must have used the term, as applicable to the object they had in view, at the time of its use, independent of its ordinary signification. We have already seen that it was the policy of the United States government, to confer on the inhabitants of the Territory, without reference to their citizenship, the right of electing and being elected to office. This peculiar policy, adopted by the Ordinance, continued the settled rule of action, and was marked by its continuance in all the acts of Congress, in reference to the Territories; and peculiarly so, in reference to Illinois, (as is shown by the act to extend the right of suffrage therein) up to the adoption of the State Constitution.

It is a matter of history, that a large portion of the inhabitants of Illinois, antecedently, and at the adoption of the State Constitution, were French and Canadian emigrants. Many had come to Illinois before the capture of the French settlements, during the revolutionary war, by George Rogers Clarke; while others arrived during the war, and some after peace had been proclaimed. The articles of compact contained in the Ordinance to embrace a stipulation in favor of the then inhabitants, which declares, "that the inhabitants of said Territory shall always be entitled to the benefit of a proportionate representation of the people in the legislature;" and they were also declared, "subject to pay a part of the federal debt, and a proportional part of the expenses of government, to be apportioned on them by Congress, according to the same common rule and measure, by which apportionments should be made on the other States."

One of the many reasons for the introduction of the policy of permitting aliens to vote, and be voted for, as declared in the Ordinance, and the legislation of Congress, is to be found in the aforegoing stipulations; and sufficiently explains, in connexion with others to be hereafter adverted to, the causes of its adoption and continuance.

Pursuing the same spirit of justice and liberality, the framers of

the State Constitution intended to carry out a continuance of the policy of admitting to vote, not only those who were inhabitants of the Territory at the time of the adoption of the Constitution, but, also, all those who might subsequently become inhabitants of the State, and should become otherwise qualified to exercise the right of suffrage, there, as citizens of the United States. It was but in accordance with the policy which had antecedently prevailed; and was further supported, as is well known to those who heard the discussions in the Convention, by the supposition that the exercise of this political right, with the further one, to be enacted by the legislative department, of holding, conveying, and devising real estate, would induce a flood of emigration to the State, and cause its early and compact settlement. That such was its influence on the Convention, is believed to be beyond doubt; though its effects and influences may have failed in the extent of its anticipated operations.

That it is the just and reasonable interpretation of the 27th section, may be further established by a recurrence to the Congressional debates, which occurred on the discussion relative to the admission of the State of Michigan into the Union.

On the 29th of March, 1836, a debate arose in the Senate of the United States, on the bills to establish the northern boundary line of Ohio, and for the admission of Michigan into the Union. On that occasion, in adverting to the clause in the Constitution of Michigan, defining her boundaries, which conflicted with those of Ohio, exception was taken to the 2d article of the Constitution of Michigan. The article is as follows:

" In all elections, every white male citizen above the age of twenty-one years, having resided in the State six months next preceding any election, shall be entitled to vote at such election; and every white male inhabitant, of the age aforesaid, who may be a resident of this State at the time of the signing of this Constitution, shall have the right of voting as aforesaid; but no such citizen or inhabitant shall be entitled to vote, except in the district, county, or township in which he shall actually reside at the time of such election. "

Senator Buchanan, in that debate, remarked, " that it had been said that Michigan ought not to be admitted under her present Constitution, because, by it, every white male inhabitant in the State had the right of voting, contending that this provision gave the right of suffrage to others than citizens of the United States. He asked gentlemen to mark the distinction here drawn by the gentleman from Delaware, and to judge whether this objection was well founded. Michigan confined herself to such residents and inhabitants of her Territory as were there at the signing of her Constitution; and to those, alone, she extended the right of suffrage.

" Now we have admitted Ohio and Illinois into this Union, two sister States, of whom we ought certainly to be very proud. He would refer Senators to the provision in the Constitution of Ohio on that subject. By it, all white male inhabitants, twenty-one years of age or upwards, having resided one year in the State, are entitled to vote. Michigan had made the proper distinction. She had very properly confined the elective franchise to inhabitants within the State at the time of the adoption of the Constitution. But Ohio had given the right of suffrage, as to all future time, to all her white inhabitants over the age of twenty-one years ; a case embracing all time to come, and not limited as in the Constitution of Michigan. He had understood that Ohio, since the adoption of her Constitution, had repealed this provision by law. He did not know whether this was so or not, but here it was, as plain as the English language could make it, that all white male inhabitants of Ohio, above the age of twenty-one years, were entitled to vote at her elections. Well, what has Illinois done in this matter ? He would read an extract from her Constitution, by which it would appear, that only six months previous residence was required to acquire the right of suffrage. The Constitution of Illinois was, therefore, still broader and more liberal than that of Ohio. There, in all elections, all white male inhabitants above the age of twenty-one years, having resided in the State six months previous to the election, shall enjoy the right of suffrage.

" Now, Sir, it has been made a matter of preference by settlers, to go to Illinois, instead of other new States, where they must become citizens before they could vote ; and he appealed to the Senators from Illinois (who admitted such was the fact) whether this was not now the case ; and whether any man could not now vote in that State after a six months' residence.

" Now, here were two Constitutions of States, the Senator from one of which was most strenuously opposed to the admission of Michigan, which had not extended the right of suffrage as far as was done by either of them. Did Michigan do right in thus fixing the elective franchise ? He contended that she did act right, and if she had not so acted, she would not have acted in obedience to the spirit, if not the very letter, of the Ordinance of 1787. Michigan took the right ground, while the States of Ohio and Illinois went too far, in making perpetual in their Constitutions, what was contained in the Ordinance. When Congress admitted Ohio and Indiana on this principle, he thought it very ungracious in any of their Senators or Representatives, to declare that Michigan should not be admitted, because she had extended the right of suffrage to the few persons within her limits, at the adoption of her Constitution."

Senator Ewing, of Ohio, urged, that the precedents referred to by the Senator from Pennsylvania, were admitted under trouble-

some circumstances, but ought not to be followed.(1)   On the ninth of June following, on a debate which arose in the House of Representatives of the United States, on the same bill, for the admission of the State of Michigan into the Union, Mr. Everett, among other grounds assumed by him, as causes of objection to her admission, stated those which related to her Constitution : First, " It was formed by a Convention elected in part by foreigners."   Secondly, " It naturalized foreigners."

In the analysis which he made, on the occasion referred to, of the various provisions of the Ordinance of 1787, and examined on this occasion, it will be seen from his argument, that he conceded the Ordinance of 1787 admitted foreigners to vote under the territorial government, and that " the privilege of extending to foreigners the right of voting for representatives of the territorial legislature, has been extended to the election of delegates of the conventions for forming State Constitutions.   He remarked, " That in the act of 1802, for the formation of the Constitution of Ohio, the persons entitled to vote were all male citizens of the United States, of full age, resident within the Territory for one year, having paid a territorial or county tax ; and all persons having, in other respects, the legal qualifications to vote for representatives in the General Assembly of the Territory."   " The latter clause," he said, " must refer to the provisions in the Ordinance of 1787, before stated."   He said the acts of the 3d March, 1811, and 20th May, 1812, extended the right of suffrage in Indiana and Illinois, to every free white male person of the age of twenty-one years, who shall have paid a county or territorial tax, and resided one year in the Territory.

" The acts of 19th April, 1816, and 18th April, 1818, authorizing the election of conventions to form Constitutions in those States, authorize every free white male citizen of the United States, and all persons having in other respects the legal qualifications, to vote for representatives, to vote for delegates of the convention.

" Thus (he declared) aliens have been permitted to vote for delegates to the conventions for forming the Constitutions of Ohio, Indiana, and Illinois ; but would Congress, in the case of Michigan, have allowed aliens to vote ? "

Mr. Everett then proceeded to show, that the case of Michigan was different from Ohio, Indiana, and Illinois, because, although the act of 1808, establishing the Territory of Michigan, secured to the inhabitants the same rights of voting that were granted by the Ordinance of 1787, yet, the act of the 16th February, 1819, authorizing the Territory to send a delegate to Congress, conferred the right of suffrage to only free white male citizens of the Territory, who had resided one year therein next preceding the elec-

(1) 2 Cong. Deb. 1014, 1015.

tion, and had paid a county or territorial tax, and that in addition thereto, the act of 3d of March, 1823, virtually repealed all prior acts, relating to the rights of suffrage, providing, " that all citizens of the United States, having the qualifications prescribed by the act of 16th February, 1819, shall be entitled to vote at any public election in said Territory, and shall be eligible to any office therein," thereby taking away all rights, by such repeal, existing under those laws.

He then says : " Thus, at the time of the calling of the convention for the formation of the Constitution of Michigan, it was the fundamental law of the Territory, that none but citizens of the United States, who resided in the Territory one year next preceding the election, and had paid a county or territorial tax, should be entitled to vote." He then proceeds to say, " That there were several reasons for this law, as applied to Michigan, which did not apply to either of the three States. The Territory of Michigan, on its whole settled frontier, was contiguous to a foreign thickly settled country, whereas that was not the case with either of the other States ; and it was necessary to change the law, so as to prevent such foreign population, easily transported across the line, from voting at our elections. Yet, in the face of the law of the land, the territorial legislature has authorized for eigners to vote, and those who had resided in the Territory only twenty-two days previous to the passage of the act. The act was passed on the 26th day of January, 1835. In the second section the qualification of voters is prescribed : ' Sec. 2. That the free white male inhabitants of the said Territory, above the age of twenty-one years, who shall reside therein three months immediately preceding Saturday, the fourth day of April next, in the year 1835, be, and they are hereby authorized to choose delegates to form a convention, who shall be elected in the several districts as follows.' Would Congress have passed an act of this description ? If not, will they sanction it ? The act is a fraud on the rights of the citizens of the United States in that Territory. The Constitution, then, is the result of foreign votes, and accounts for that objectionable clause in it which naturalizes those foreigners who thus secured the victory."

The Constitution was signed on the 24th June, 1835, and contains the second article already quoted, and upon which Mr. E. remarked : " Thus every foreigner of the age of twenty-one, who resided in the Territory on the 24th day of December, is naturalized by this article of the Constitution, and clothed, in express terms, with the highest political privilege of a citizen of the United States.

" Under a Constitution thus formed, and containing this unconstitutional article, I cannot consent to admit Michigan into the Union."

Mr. Russell, Mr. Hamer, and other members, during the de-

bate, assumed similar grounds, and gave similar reasons for their opposition to the admission of Michigan into the Union. From these debates, which will be found in Vol. 12, Parts 1 and 4, Congressional Debates, it will be perceived, that there was no difference of opinion as to the effect of the use of the terms, "white male inhabitants." All agreed, those for, as well as those opposed, to the admission of Michigan, that those terms conferred the right of voting on unnaturalized inhabitants, provided they possessed the other requisite qualifications.

The reasons and argument of the able and talented individuals who participated in the debates on that occasion, are not referred to, by any means, as conclusive authority on the question now under consideration ; but, as high evidence of the correctness of the expositions which were then given on a question, which is, as to the accurate and practical definition of the terms used, directly in point, and precisely parallel.

The extent of the political rights acquired by the terms used, were not doubted, nor was their application questioned. Throughout the debate, the point was conceded ; but the policy of incorporating the right, was reprobated and condemned by those who opposed her admission into the Union.

To show, however, that the position assumed, which asserts the terms inhabitant and citizen to be synonymous and correlative, is not sustainable, even in a political sense, the following extract is transcribed from the report of the Committee on Elections, in the Congress of the United States, in the case of John Bailey, which transpired in 1824. This report was approved by Congress, and Mr. Bailey ejected from his seat by a very large majority of the House, without distinction of party. On enquiry into the meaning of the word inhabitant, as used in the Constitution of the United States, in reference to the qualification of a Representative in the Congress of the United States, the committee remark : " Having examined the case in connexion with the probable reasons which influenced the minds of the members of the Convention, and led to the use of the word inhabitant, in the Constitution, in relation to Senators and Representatives in Congress, it may not be improper, before an attempt is made at a further definition of the word, a little, to consider that of citizen, with the view of showing that meaning of the misconceptions in respect to the former, have arisen from confounding it with the latter. The word inhabitant comprehends a single fact, locality of existence ; that of citizen, a combination of civil privileges, some of which may be enjoyed in any State of the Union. The word citizen may properly be construed a member of a political society ; and although he might be absent for years, and cease to be an inhabitant of its territory, the right of citizenship may not thereby be forfeited, but may be resumed whenever he may choose to return."

From what has been already said, it must appear, that the words citizen and inhabitant cannot be considered synonymous.

In the 3d section of the 2d article of the State Constitution, the words inhabitant and citizen are used in juxtaposition. The representative is to be not only a citizen of the United States, but an inhabitant also of the State.

Another authority may be found in Vattel, supporting very clearly this distinction. In Book 1, Chap. 19, § 213, he says: " The inhabitants, as distinguished from citizens, are strangers who are permitted to settle and stay in the country. Bound by their residence to the society, they are subject to the laws of the State, while they reside there, and they are bound to defend it while it grants them protection, though they do not participate in all the rights of citizens."

This authority shows very plainly the distinction between the citizen and the inhabitant ; and that the latter appellation is derived from abode and habitation, and not from political privileges.

In further support of this principle of distinction, reference may be had to the act of Congress of the 1st of March, 1790, entitled " *An Act providing for the Enumeration of the Inhabitants of the United States.*" This act provides, " That the marshals of the several districts of the United States, shall be, and they are, hereby authorized to cause the number of inhabitants within their respective districts to be taken." It further provides, " That a perfect enumeration and description of all persons resident in the district, shall be made." Thus showing, in the opinion of Congress, that the persons residing or living in the respective districts, were the inhabitants thereof.

This is also the sense in which the term inhabitant is used in the State Constitution. Whenever the qualifications of eligibility for office are defined, it uses the term citizen of the United States, as contra-distinguished from inhabitant. So, on the contrary, when the qualifications of a voter or elector are named, it uses the word inhabitant, and has no reference to that of citizen. Nor are the terms in that instrument confounded, or used indiscriminately, as equivalent phrases ; thus, Art. 2, § 27, " All white male inhabitants shall enjoy the right of an elector." Not all white male citizens who are inhabitants. So in § 12th of the Schedule, it conferred the right of voting at the first election held under the Constitution, on all white male inhabitants, actual residents of the State at the time of signing the Constitution ; showing most distinctly, that citizenship of the United States was by no means regarded as one of the qualifications of an elector. It embraced all who were at the time actual residents of the State, without regarding how long they had been residents. It was enough, if they were so at the time specified. Again ; the Constitution uses the word inhabitant when referring to the masses of population, includ-

ing all.   Thus senators and representatives are to be apportioned according  to  the  number  of  white  inhabitants.    Art.  2, § 5. "An  enumeration  of  all  white  male  inhabitants  shall  be  made." Art. 2, § 31.

All lands which have been granted as a common to the inhabit-ants, &c.   The General Assembly shall have  power  and authori-ty to grant the same privileges to the inhabitants of  the  said villa-ges of  Cahokia and  Prairie Du Pont, as are granted to the inhab-itants  of  other towns.    Art. 8, § 8.

So  in  the  State legislature, the terms and the distinction be-tween citizen and inhabitant, have ever been  understood and used. Thus the act for taking the census provides for making an enumer-ation  of  the inhabitants  of  the State. (1)

The act of  1827, relative to  grand  and petit jurors, has these peculiar expressions, " That all free white male taxable inhabitants, in any county of this  State, being  natural  born  citizens  of  the United States, or  naturalized according  to the Constitution and laws of the United States, and of this State, between the ages of twenty-one and sixty years, (with certain enumerated exceptions,) shall be considered and deemed as competent persons to serve on grand and petit juries." (2)   In this provision, the exception therein contained of citizenship, clearly indicates that an inhabit-ant is not necessarily a citizen ;  on the contrary, it asserts the ob-vious distinction, and that the term does not by any means im-ply citizenship.

It would be almost a waste of labor to attempt to prove the contrary ; hence it would be no more than rational to suppose that distinction to be well understood and settled.

If any doubt could be supposed to remain in reference to the true interpretation of  the meaning of the Constitution on this ques-tion, it is supposed such doubt will be dissipated on recurring to the provision of the election law passed by the first legislature held under the Constitution, by which the judges of the election are to test the elector's right of  suffrage.    This act was approved and in force on the first of March, 1819.   The 14th section is as follows : " And be it further  enacted, that whenever any  person  shall pre-sent himself to give his vote, and either of the judges shall sus-pect that such person does not possess the qualifications of an elector, or, if his vote shall be challenged by any elector who has previously given in his vote at such election, the judges of the election shall tender to such person an oath or affirmation in the following form : I, A. B., do solemnly swear, that I have resided in this State for the period of six months immediately preceding this election ; that I have, to the best of my knowledge, attained the age of twenty-one years ; and that I have not voted at this

(1) R. L. 114; Gale's Stat. 135.          (2) R. L. 378; Gale's Stat. 395.

election. And if the person so offering his vote, shall take such oath or affirmation, his vote shall be received, unless it shall be proved by evidence satisfactory to all the judges, that the said oath or affirmation is false. But if such person refuses to take such oath or affirmation, his vote shall be rejected." The residue of the section declares, that taking a false oath in order to vote, shall be deemed perjury, and punished as such. This act was the first exposition, given by the first legislature which sat after the organization of the State Government. It is its solemn and deliberate interpretation of the Constitution, on the qualifications necessary to be possessed by the person claiming the right of an elector, and should be held to be conclusive of its real meaning. It is couched in the almost literal language of the Constitution, and is, as such, its best exponent.

What are the facts the person offering to vote is required to depose ?

1st. That he is a resident of a particular township. 2d. That he has resided in the State six months immediately preceding the election. 3d. That he has, to the best of his knowledge and belief, attained the age of twenty-one years ; and that he has not voted at the election at which he then offers to vote.

The term resident, to which he is required to swear, may be considered less restricted in its sense and meaning, than inhabitant, for which it seems to have been used as equivalent. It is certainly not to be considered more comprehensive, and implying other qualifications than those enumerated. If the term inhabitant had been used instead of resident, it would not have implied any more than is implied by the term resident, though the literal language of the Constitution.

Indeed, if any inference is to be drawn from the use of the term resident, it is certainly fair to presume, that by its use, the members of the legislature intended to declare, that the term inhabitant did not imply citizen, but one who was a resident of the State, and is an explicit interpretation that the term inhabitant meant absolutely, one who dwells in the country. What is a resident but an inhabitant ? And is it not directly contra-distinguishable from a citizen who may not be an inhabitant ?

There is one remarkable fact connected with the history of the adoption of the election law, by the first legislature, and that is, that one third of the persons who were members of the State convention which framed the Constitution, were members of that General Assembly ; hence the inference is irresistible, that the interpretation they have put on the 27th section of the 2d article of the State Constitution, which defines the qualifications of an elector, by the election law of 1819, is the only true exposition of that article.

In 1821, the act of 1819 was revised, and the only change made

in the oath required to be taken by the elector, was the substitution of the word "county" for "township."

In the years 1823, 1825, 1829, and 1833, this act again underwent revision; but no change was made in this section, except the addition after the words "county of," the words "in the State of Illinois"; thus leaving the section, to this day, as it stood, as to the qualifications of electors, at its adoption. It has, therefore, been the fixed and unchanged legislative interpretation of the Constitution, for a period of more than twenty years, universal in its operation, and undisputed up to the present time.

This contemporaneous legislative exposition, which was coeval with the State government, has assuredly settled the question. It is conceived to be no longer an open or debatable one, and ought not now to be disturbed. The practice under it, and the universal acquiescence of all departments of the government, and of the people in it, ever since the creation of that government, ought to be considered as a positive affirmance of its correctness. It is a contemporaneous exposition of the more forcible nature, and too obstinate and strong to be now shaken by objections which are of very recent origin. Not only has the legislative and executive departments, on all occasions when the law was presented for their action, sustained, but the Council of Revision, composed in part of all the members of this Court, with whom is lodged the veto power, has given to it its repeated and united sanctions; as well as those who composed the judicial department, and who were chosen under the Constitution, immediately after its adoption, as those who have subsequently succeeded them, and have been members of this Council.

From an examination of the journal of the Convention, the 27th section seems not to have undergone any revision. It stands in the Constitution as it did in the original draft. But the 11th section of the 3d article, which provides for the election of sheriffs and coroners, presents one fact, deemed material in the consideration of the present question; one, it is thought, affording much light on the meaning of the term inhabitant, as used by the members of the Convention, and as they then understood it. On the 12th of August, 1818, Mr. White, chairman of the Committee appointed to frame and report to the Convention, a Constitution for the people of the Territory, reported a draft of a Constitution. The 11th section of the 3d article of this draft, contained the following provision: "There shall be elected, in each, and every county in the said State, one sheriff and one coroner, by the citizens who are qualified to vote for members of the assembly, and shall be elected at the places where elections for members of the General Assembly are held, and shall be subject to such rules and regulations in said elections, as shall be prescribed by law. The said sheriffs respectively, when elected, shall continue in office two years, be subject to removal or disqualification, and such other rules and regulations as

may, from time to time, be prescribed by law. No sheriff shall be eligible for said office for a longer term than four years, in any term of six years."

This section, it will be perceived, was materially amended, in the Convention, in many respects, before its final adoption, and the word " citizen " stricken out, and the word " those " adopted in its stead; thus making the provision as it now stands in the Constitution, in this particular, read thus: " There shall be elected by those who are qualified to vote for members of the General Assembly, and at the same times and places where the election for such members shall be held, one sheriff and one coroner, whose election shall be subject to such rules and regulations as shall be prescribed by law."

The Convention seem to have studiously avoided the use of the term citizen, wherever the qualification for voting was in question; and in no instance have they adopted it as a correlative term with inhabitant, except in the 23d section of the 8th article, where it is declared that " Every citizen may freely write and print on every subject, being responsible for the abuse of that liberty ;" and in the first article of the 7th section, providing for the holding of a Convention to amend the State Constitution, wherein it declares " and if it shall appear that a majority of all the citizens of the State, voting for representatives, have voted for a Convention, the General Assembly, at its next session, shall call a Convention." Now, a person may be, in the ordinary sense of the term, a citizen of this State, but still not a citizen of the United States. The term here used is not conceived to be in any other sense, than that of an inhabitant; because, if such had been the sense of the Convention, it would, doubtless, have used the term citizen, instead of inhabitant, in the article defining the right of suffrage. The consequence of insisting that additional qualifications of citizenship should be required, would be most onerous, in its operation, on a numerous portion of the French inhabitants, who came to the country since 1787, as we have already shown, and who have reposed in good faith under the hitherto admitted and undisputed recognition of their political rights. There are many of them neither citizens by birth nor adoption ; and to now interpose a regulation that would disfranchise them, would be most unjust. To say that they shall not now enjoy, under the Constitution which they in part assisted to form and ratify, rights . which they have exercised ever since its formation, would be most dangerous for its unexampled character of bad faith, and for its innovation on rights hitherto conceded without question. It will not even do to say, that they may be admitted the exercise of the right of suffrage, though aliens, and that they are not the aliens intended to be excepted in the construction proposed to be given to the Constitution, by those who insist, that under the term inhabitant, none but citizens of the United States are meant. The exclusion must,

of necessity, reach them, if it reaches others, because they are citizens of the United States, and were not included in the Ordinance, as the persons whose rights were saved thereby.

If, under the general provision which conferred on them the, elective franchise, natives of other countries who are inhabitants of the State, are entitled to similar privileges, which it is supposed, ought not to have been, as a matter of sound policy, bestowed on them, it is no sufficient reason, because those rights have been thus incidentally extended, that the early emigrants should, for such cause, suffer a deprivation of those which they are of right entitled to.

It is, however, apprehended, that the authors of the Constitution, for the reasons already stated, intended to extend the right of suffrage to those who, having by habitation and residence identified their interests and feelings with the citizen, are upon the just princples of reciprocity between the governed and governing, entitled to a voice in the choice of the officers of the government, although they may be neither native nor adopted citizens.

If the right of suffrage be a natural, and not a conventional one, there can be no just cause for abridging it, unless by way of punishment for crime, and under very peculiar circumstances, and for peculiar causes.   The Convention had, doubtless, a desire to make the recognition of the right, stand on as extensive grounds as were compatible with the perpetuity of the compact they originated, and the good order of society, the protection of the rights declared. In this spirit of interpretation, it is supposed the views of its members will be best supported and maintained.   The sentiments here expressed, seemed to have been entertained by the Convention, and expressed in the concise but comprehensive declaration contained in the 5th section of the 8th article of the Constitution, which says : " That all elections shall be free and equal."   There is, however, another view, in which this question is to be considered.   The provision regulating the mode of challenge to the elector's right to vote, declares, that if the oath or affirmation prescribed, shall be taken, the elector's vote shall be received, " unless it shall be proved by evidence satisfactory to a majority of the judges, that said oath or affirmation is false."   The judges, then, where the oath is taken, or affirmation is made, and such oath or affirmation is not proven by evidence satisfactory to a majority of them, to be false, have no discretion.   They are bound to receive the vote, and moreover, by another provision of the election law, are subject to a severe penalty in case of refusal.

Whether the elector be a native, or adopted citizen, or an unnaturalized foreigner, they have no right, nor are they bound by any necessity in the discharge of their duty, to enquire.   They are vested with no discretion in the matter.   If the elector possesses the qualifications required by law, which we have seen are

few and simple, all extraneous enquiries are irrelevant to the performance of their duty.

They can no more add to, than they can diminish the law, by their opinion of what it ought to be. Nor can any interpretation be put on it by them, to disfranchise those whom the law clearly embraces within its provisions. The law is so plain and simple, that it carries on its face its own obvious meaning, and is not susceptible of doubt or ambiguity. The oath has been made the test of the right to exercise the franchise, and contains within itself the standard by which that right is to be determined. Unless the legislature shall make citizenship an indisputable qualification to the enjoyment of the elective. franchise, and the Constitution clearly admits of the exercise of that power by that body, this tribunal cannot add such a prerequisite by construction.

In reference to the construction which may have been given in other States, by legislative enactments, as to the meaning of the term inhabitant, and that it is to be considered citizen, I cannot, even admitting it may have been there correctly decided, on such occasions, see any reason for the adoption of such a construction on the present occasion. In the first place, it seems to me to be a perversion of the use and meaning of language, as universally understood, and an imputation on the authors of its use, in the cases referred to, of a want of knowledge of the appropriate meaning of terms. It is clear that a person may be a citizen of the United States, when he is an inhabitant of a foreign State.

But the adoption of such a rule as has been resorted to in other States, by which a term admitting, it would seem, of no doubt of its true sense, has been made to imply the very converse of its universal acceptation, is eminently forbidden here.

It cannot, in my judgment, be just, because of the facts which existed at the time of its use in the Ordinance of 1787. The evident sense in which it is employed in that Ordinance, and the subsequent facts which followed, and have uniformly accompanied its employment, from its incorporation in the territorial laws of the Northwestern Territory, the acts of Congress for the admission of those Territories and reception into the Union, and the steady and uniform rule adopted by every department of the government of this State, without a single exception, up to the present hour, should be conclusive of its meaning.

It is well understood that it was the policy of the Congress of the United States, at the formation of the Ordinance of 1787, to invite emigration into the Northwestern Territory. And hence, as one strong inducement for emigration, the right of suffrage was extended to aliens in those Territories, as they should be successively formed out of the Northwestern Territory proper.

Whatever may have been the causes and motives which induced New York, or Massachusetts, or any other State, to give the

legislative interpretation which has been done, to the clauses of their Constitutions which regulate the right of suffrage in those States, the facts and circumstances which existed in reference to the States formed out of the Northwestern Territory, did not in any way occur there, consequently, their decisions form no guide, admitting they were correct, on the present occasion. But it may be said, Ohio is one of the States formed out of that Territory, and she has adopted the exposition, and construed the term inhabitant to mean citizen. Under what particular causes the legislative construction adopted by her legislature in 1831, was brought about, the means of determining are not at hand ; nor can it be averred, with certainty, what was her practice, anterior to the passage of that act. In the very first act adopted by her legislature, after the formation of her Constitution, it is certain that no prohibition to the reception of aliens' votes existed, nor up to the passage of the act of 1831.

That act was passed on the 15th April, 1803. The 13th section of the act, provided that the elector should openly, and in full view, present his ballot to the judges of the election, on which should be written or printed the name of the person and office voted for ; and it confined the elector to the township in which he resided.

The 14th section is in these words : " That the judge to whom the ticket shall be delivered, shall, upon the receipt thereof, pronounce with an audible voice the name of the elector ; and if no objection be made to him, and the judges be satisfied that the elector is legally entitled to vote at that election, he shall immediately put the ticket into the box, without inspecting the name or names written thereon."

The 15th section declares : " That when objections are made to an elector, and in all other cases where the qualification of a person to vote is a fact unknown to either of the judges, they shall have power to examine such person on oath, or affirmation, touching his qualifications as an elector, which oath or affirmation either of the judges is hereby authorized to administer." Laws of Ohio, 1803.

In 1809, an act was passed on the 15th of February, amendatory of the act of 1803, by which the 15th section referred to and quoted, was amended by the addition of the following, after the words, " touching his qualification as an elector," " or they may enquire into the qualification of such elector, on the oath or affirmation of disinterested witnesses, which oaths or affirmations, either of the judges is hereby authorized to administer."

From these general provisions, the judges of the election were constituted the sole judges of the qualifications possessed by the elector presenting himself to vote under the provision of the State Constitution, which, except as to the time of residence and pay-

ment of a tax, is similar to our own. What was the early practice under the Constitution and laws of Ohio, no distinct means of knowing accurately are at hand.

It has been distinctly affirmed, that the early practice was to admit aliens, as had been the rule while under a territorial government, and such would seem to have been the intention of the legislature, by the passage of the acts of 1803 and 1809.

They gave no legislative construction to the first section of the 4th article of their State Constitution, probably conceiving it so explicit, that no one could be mistaken in the meaning of the term inhabitant.

It has, however, been affirmed in a debate which occurred in the United States' Senate, in 1836, on the question of the admission of Michigan into the Union, before referred to, that such was the practice in Ohio, and as distinctly admitted in that debate, by Senator Ewing, of Ohio, who said, " that was done in troublesome times." On the 13th February, 1831, we find the legislature of that State passed an act, by which they gave not only, it is conceived, a legislative exposition to the first section of the 4th article of the Constitution of that State, denying the right, and changing the practice, but absolutely adding the additional qualification of citizenship, to authorize the elector to vote. The 10th section of that act is as follows : " That the judge to whom any ticket shall be delivered, shall, on the receipt thereof, pronounce, with an audible voice, the name of the elector ; and if no objection be made to him, and the judges be satisfied that the elector is a citizen of the United States, and legally entitled, agreeably to the Constitution and laws of the State, to vote at the election, he shall immediately put the ticket in the box, without inspecting the names written thereon, and the clerk shall enter the names," &c.

Here it will be perceived, that the elector is required to be a citizen of the United States, in addition to being legally entitled agreeably to the Constitution and laws of the State to vote, before he can be admitted to vote in that State. Now was it not enough under the Constitution, that he was "a white male inhabitant of the State, had resided one year next preceding the election therein, and had paid, or been charged with, a State or county tax," to entitle him to vote ? The Constitution required no more ; but the legislature required what the Constitution does not. They superadd the requisition of citizenship, — attempt to extend the Constitution, and impose a condition beyond the Constitution itself. They do not say the terms, white male inhabitant, shall be construed to mean citizen, but that the party shall possess this political character before he shall enjoy the right of suffrage.

I have not the means of knowing under what particular circumstances, twenty-eight years after the adoption of the Constitution, and the passage of the first law relative to the elective franchise,

it became necessary to make this radical change in the law, evincedly an attempt to change rights guarantied by the Constitution of the State. But if history is to be consulted, the same debate which occurred in the Senate of the United States would seem to furnish the clue :· Senator Benton, after remarking on the duty of Congress to guarantee the republican character of a State Constitution, added " and for that purpose had cognizance over the State Constitutions, and for nothing else. Any thing further, was an invasion of the rights of the States, and Congress had no right to meddle with the qualifications of voters in any of the States, old or new. This brought him to the objection, that the voting privilege was extended to the inhabitants of the Territory at the time of the adoption of the Constitution, and not confined to those, who were citizens of the United States. He left this question where it had been placed by others, as an affair that belonged to the State, and which every State had decided for herself, and many of them, so as to give aliens the right of voting, and even holding office. He referred to Illinois, Louisiana, and even Ohio, and asked : Was it not matter of history, that, within a few years past, the legislature of Ohio had decided, that the word inhabitant meant citizen ? And they defined it so, because a gentleman, who was a subject of the king of Great Britain, was presiding over their deliberations, and might act as their Lieutenant-Governor."

It seems that in 1814, an action was brought in Ohio, in the county of Jefferson, against three persons as judges of an election in that State, who had refused to receive the vote of a person of the name of Johnston, on the ground that he was not a citizen of the United States, but an alien, and a native of Great Britain, and had not been naturalized agreeably to the laws of the United States, and was not, according to the laws of Ohio, entitled to vote at such election ; and on the further ground, that Great Britain and the United States were at war at that time. The question having been decided on a demurrer to the pleas of justification, which contained the causes above stated, as the grounds of defence, the Supreme Court of that State, in 1817, decided the pleas to be a bar to the action, and rendered judgment accordingly in favor of the defendants. The case has never been reported, and it is well understood that there is no written opinion remaining on file in that Court, which disclosed the reasons on which the judgment was predicated ; whether on the ground of the plaintiff's being an alien enemy, or an unnaturalized citizen, or whether he was excluded by the qualifications of the election laws of that State, then in force. The pleadings in the cause show that the defendants rested their defence of justification in their refusal to receive the vote, on the laws of the State then in force, and not on the provisions of the Constitution of the State. No question

appears, from the record, to have been raised, whether the laws prescribing the qualifications were in conflict with the Constitution ; and we are wholly unable to determine what may have been the reasons and the grounds on which the Court decided. The rule, however, in that case, would not be a safe one to follow. Nor can it, under the circumstances, be considered of any authority. Under all the facts and views already stated, it would be inapplicable to our condition ; and its operation would be in conflict with the principles we have already stated, which time and practice have justly consecrated.

There has been an argument advanced, which it is here proper to notice. It is said, that in case of war, a resident native of the belligerent country with whom we may be waging hostilities, in the act of voting, might be restrained in the exercise of his right as an elector, by virtue of an order of the President of the United States, to the Marshal of the district, under the act of Congress concerning aliens in time of war, to remove such person to some remote point.

Admitting the whole extent and force of the argument, it but proves, that under such a state of facts, the right would be imperfect. But surely, it does not prove that it is not a right which has been conferred, because of the exception to its exercise in the particular case supposed. The State law gives the right to exercise the power of voting, where the qualifications and means of enjoyment exist. If, from any particular cause, the party is deprived of the exercise of the right, it by no means proves its nonexistence. An alien enemy loses the right of prosecuting civil remedies in time of war ; yet, in time of peace, he is in the full enjoyment thereof. Here it might be said, that because there is a suspension of the right, that it does not therefore exist ; yet it is seen, that the right, otherwise perfect, is only suspended under particular causes.

There is a portion of the case which ought not in my judgment to escape remark. It is the admission by Spragins, that he received and counted the elector's vote, believing at the time, that he was not a qualified voter. " He himself" (says the case) " believing that the Constitution and laws of this State, not only required a residence of six months, but, also, that the person offering to vote, should be a citizen of the United States." It will also be seen, that this admission forms one of the strong grounds of the judgment of the Circuit Court. The third reason given in the record, for the judgment, is in these words : " That the defendant, in admitting and counting the vote of Kyle at the election referred to, believing as it seems he did, at the time it was received, that he was not a qualified voter, was guilty of manifest misbehavior." " The defendant by his conduct at this election, as shown by the facts presented, is brought within the provisions

of the section of the law above recited, and is subject to the penalties therein prescribed."

When the character of the punishment of a judge of election, for the admission, knowingly, of the vote of any person not qualified to vote, according to law, is seen to be, that of a large pecuniary fine, and the rendering of him infamous for ten years, it is not without sensations of surprise, that such a confession is seen placed upon the records of a court of justice, by consent.   The officer who here has consented to place himself before the Court, in what is esteemed a novel attitude, to use no stronger expression, had taken an oath to perform the duties of judge of the election, according to law, and to the best of his abilities ; and to studiously endeavor to prevent fraud, deceit, and abuse in conducting the same ; and he has, it seems, further consented (under what influences it is not pretended to determine) to acknowledge a pretended breach of that duty, which he so solemnly declared, by an oath, he would scrupulously fulfil.   If he conscientiously believed the law and Constitution to be what its text does not import, he should, nevertheless, have acted in accordance with his belief and judgment, and refused the admission of the vote tendered.

It will not be presumed that this confession, so extraordinary in its character, has been made for the purpose of subserving any particular end, or the accomplishment of any particular object or purpose.   But, most assuredly, the inferences cannot but be peculiar in their nature ; and the expression, that this part of the case had better have been omitted, cannot be withheld.

After the most careful examination, and consideration of the questions raised, the conclusions arrived at are, that Jeremiah Kyle was a person legally qualified under the Constitution and laws of the State of Illinois, to vote at the election specified in the agreed case ; and that the judgment of the Circuit Court, which decided that Kyle, in order to be entitled to vote at such election, should have been either a native, or naturalized citizen of the United States, at the time of the presentation and reception of his vote, is erroneous, and not warranted in law, and ought to be reversed.

Lockwood, Justice, concurring :

I concur in the opinion that the judgment below ought to be reversed, for the following reasons.   It appears in the agreed case, that Spragins was sued in the Court below, as one of the judges of election, for the penalty of one hundred dollars, given by the 23d section of the "*Act regulating Elections*," passed the 10th January, 1829.   That section provides, that, "If any judge of the election, clerk, or other officer or person in anywise concerned in conducting the election, shall knowingly admit any person to vote, not qualified according to law, each and every person so offending, shall forfeit and pay to the county the sum of one hundred dollars," &c. (1)

(1) R. L. 253, 254, Gale's Stat. 268.

The agreed case admits that one Kyle voted at the general election in 1838, for Governor and other officers, and that Kyle was a foreigner, and had not been naturalized under the laws of Congress, but had resided in the county of Jo Daviess, where the vote was received, for more than six months immediately preceding the election. The case further admits that Spragins acted as a judge of the election, and knew that Kyle had not been naturalized, yet received his vote. It is also admitted that Spragins believed that Kyle was not a qualified voter, according to the Constitution and laws of this State, because he had not been naturalized.

In ordinary civil actions, where a defendant admits that he is guilty, such admission would justify the Court in giving judgment against him ; but this is a highly penal action, and if the defendant is guilty, in addition to a fine of one hundred dollars, he is, moreover, on conviction, rendered incapable of holding any office within this State, for the term of ten years thereafter.

The admission appears to have been made with a view to elicit from this Court, a construction of the Constitution and laws of this State, in relation to the right of aliens to vote. This renders it necessary to decide whether Spragins, in suffering Kyle to vote, without challenging him, has subjected himself to the penalty of one hundred dollars, and disfranchisement for ten years.

The 12th section of the act regulating elections, provides, that " When any person shall present himself to give his vote, and either of the judges shall suspect that such person does not possess the requisite qualifications of an elector, or if his vote shall be challenged by any elector who has previously given his vote at such election, the judges of the election shall tender to such person an oath or affirmation in the following form : ' I, A. B., do solemnly swear (or affirm, as the case may be) that I am a resident of the county of ———, in the State of Illinois ; that I have resided in this State for the period of six months immediately preceding this election ; that I have, to the best of my knowledge and belief, attained to the age of twenty-one years; and that I have not voted at this election.' And if the person so offering his vote, shall take such oath or affirmation, his vote shall be received, unless it shall be proved by evidence satisfactory to a majority of the judges, that said oath or affirmation is false; and if such person refuses to take such oath or affirmation, his vote shall be rejected." (1)

These are all the provisions contained in the act, in relation to the qualifications of voters.

Did Spragins, then, in receiving Kyle's vote, violate this section of the law, so as to subject him to the penalty contained in the twenty-third section of the act ? I think not, for the reason, that it is agreed, that Kyle was a resident of Jo Daviess county, and had resided in the State for more than six months immediately preced-

(1) R. L. 246, 247 ; Gale's Stat. 263.

ing the election.   Had Kyle been challenged, he would only have been required to swear to what is admitted to be fact, by the agreed case.   A challenge, then, by Spragins, was wholly unnecessary, and would have been an act of supererogation on his part.   If Kyle had taken the oath, and it appears he could safely have done so, the judges of election would have been compelled to receive it. They have no discretionary power, for the law is imperative, that the vote shall be received, unless evidence is produced that it is false.   This falsity can only be proved to exist, by showing that the person offering to vote has not resided in the State for six months immediately preceding the election, or that he is not twenty-one years of age, or that he has voted before at the election.

Whether the person offering to vote is an unnaturalized foreigner, is a question which the judges of election have no right to investigate, under the existing laws.   If the voter comes within the letter of the law, the duty of the judge is plain.   There is no ambiguity in the word resident.   Every man is a resident, who has taken up his permanent abode in the State.

The question, then, whether Kyle was an inhabitant, and entitled to the right of suffrage, within the meaning of that word in the Constitution, is not a subject of enquiry by the judges of the election.   I am, therefore, of opinion, that Spragins, in admitting Kyle to vote, has not violated the statute, and is consequently not liable to the penalty.   On the constitutional question, whether unnaturalized foreigners, who are permanent residents of the State, have a right to vote, I forbear to express an opinion, as I believe, while our election laws remain as they are, the judges of elections are bound to receive the votes of such persons.

In support of the views above expressed, in relation to the meaning of the word " resident," I refer to the case of James Brown *v.* Richard R. Keane, decided in the Supreme Court of the United States, (1) where that Court held, that the word " resident " does not mean a citizen.

WILSON, Chief Justice :

I concur in the view taken of this case by Justice Lockwood, in his opinion, and think the judgment of the Circuit Court should be reversed, upon the ground that Spragins, the judge of the election, has not incurred the penalty of the statute, in receiving the vote of Kyle, inasmuch as the existence of all the requisite qualifications which the statute requires, in order to entitle him to vote, are admitted.   It is only when the judge of the election allows the exercise of the elective franchise by one whose right he suspects, or whose vote is challenged by another, without tendering the oath prescribed by the statute, that the judge violates his duty.   The broad and important question of the right of suffrage, under the

(1) 8 Peters 112.

Constitution, does not, according to my view of this case, arise. It is one, therefore, upon which I express no opinion.

BROWNE, Justice, said he concurred in the views taken of the case by Justice Lockwood.
*Judgment reversed.*

*Note.* An alien, otherwise qualified, may vote at elections of borough officers in Pittsburg. Stewart v. Foster, 1 Binney, 120. See, also, Acts of 1840 – 41, 111.